UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LORI L. EADS,                                      Civil No. 05-1590 (ADM/FLN)

                    Plaintiff,

v.

JO ANNE B. BARNHART,                     **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

                    Defendant.
_____

Edward C. Olson, for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.
_____

Plaintiff Lori L. Eads seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied her application for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB").  This Court has appellate jurisdiction over the

claim pursuant to 42 U.S.C. § 405 (g).  The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The parties have submitted cross-motions for summary judgment [#14 and #17].  For the reasons

set forth below, it is the Court's recommendation that the Commissioner's decision be reversed and

the case be remanded.

## I. INTRODUCTION

Plaintiff Lori L. Eads filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on November 12, 2003, alleging a disability onset date of

November 1, 2003. (Tr. at 58-60; 309-10.)  On January 9, 2004, a Notice of Disapproved Claim was

issued regarding both applications.  (Tr. at 38-40; 313.)  Plaintiff filed a request for reconsideration

on January 2, 2004.  (Tr. at 47.)  Plaintiff's request for reconsideration was denied on March 8,

2004.  (Tr. at 48-50; 315-17.)  Plaintiff filed a request for a hearing by an Administrative Law Judge ("ALJ") on March 24, 2004.  (Tr. at 51.)  ALJ Michael D. Quayle conducted a hearing on this matter on June 16, 2004.  (Tr. at 342-56.)  On June 24, 2004, ALJ Quayle issued an unfavorable decision and Plaintiff made a timely request for review of the hearing.  (Tr. at 19-33.)  On May 31, 2005, the Appeals Council denied Plaintiff's Request for Review, making the ALJ's decision the final decision of the Commissioner.  (Tr. at 9-11.)

Plaintiff initiated judicial review of this action on July 29, 2005.  (Docket No. 1.)  Plaintiff filed her motion for summary judgment on February 3, 2006, and the Commissioner filed its motion for summary judgment on March 20, 2006.  (Docket Nos. 14 and 17.)  In her motion for summary judgment Plaintiff argues that the Social Security Administration failed to meet its burden to prove that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform her past relevant work as a cleaner.  Specifically, Plaintiff alleges that the ALJ failed to grant the proper weight to the opinion of Plaintiff's treating physicians, Dr. Thomas Dashiell and Dr. Howard Dickman.  Plaintiff argues that, as a result of the ALJ's failure to give these opinions controlling weight, the ALJ's hypothetical question to the vocational expert did not properly describe all of the limitations on Plaintiff's ability to perform work activities.  Plaintiff argues that, since the hypothetical did not include all of her limitations the vocational expert's response to the incomplete hypothetical does not constitute substantial evidence to support the denial of benefits.  Plaintiff further argues that if the ALJ felt that "either doctor's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques, or that it was ambiguous or deficient in any way, it was incumbent upon the ALJ to attempt to contact the doctors to resolve any alleged inconsistencies" and the ALJ failed to do so in the present case.  (Pl.'s Mem. at 9.)

## II.  STATEMENT OF FACTS

### A.    Background

Plaintiff was born on November 10, 1964 and was 39 years old at the time of the administrative hearing on this matter.  (Tr. at 58.)  Plaintiff obtained her General Equivalency Degree and attended one year of business college at the Minneapolis Business College.  (Tr. at 78.) Plaintiff has past relevant work history as a data entry operator, accounts receivable/payable clerk and a self-employed house cleaner.  (Tr. at 117; 348.)  Plaintiff suffers from fibromyalgia, degenerative changes of the cervical and lumbar spine, status post tibial fracture and depression. (Tr. at 25.)

### B.    Medical Evidence

On December 1, 2003, Plaintiff saw Thomas Dashiell, M.D., and complained of generalized pain and a lot of fatigue.  (Tr. at 272.)  Dr. Dashiell examined Plaintiff and determined that she suffered from fibromyalgia, "chronic fatigue, myalgias, and arthralgais secondary to fibromyalgia . . . [as well as] possible gastroesophageal reflux disease" and may also suffer from a sleep disorder, particularly sleep apnea.  (Tr. at 272-73.)  Dr. Dashiell gave Plaintiff a prescription for Wellbutrin SR and referred her to a rheumatologist.  (Tr. at 273.)  Dr. Dashiell also referred Plaintiff for a possible sleep study at the Minnesota Lung Clinic.  (Tr. at 273.)

On December 9, 2003, Plaintiff went to the Minnesota Lung Clinic for a sleep study.  Dr. Thomas Mulrooney, M.D., reviewed the results.  (Tr. at 266-70.)  Dr. Mulrooney stated that there was no evidence of "obstructive sleep apnea syndrome" but that "[o]ne peculiarity of her study may be significant."  (Tr. at 266.)  Dr. Mulrooney noted that Plaintiff

> had a rather early onset of stage REM.  This is frequently seen in association with depression and this finding, together with her complaints, suggest to me that her

symptom of chronic fatigue may in fact be a part of her depressive disorder that has simply not responded fully to treatment with Celexa and Wellbutrin.

(Tr. at 266.)  Dr. Mulrooney recommended a psychiatric referral.  (Tr. at 266.)

On December 23, 2003, Plaintiff was seen by Dr. Alford Karayusuf for a mental status examination.  (Tr. at 235-36.)  Plaintiff related to Dr. Karayusuf that she has a long history of recurring problems with depression, and that she has been "episodically involved in psychiatric care and counseling, . . . [and] from 1998 to 2001, during which time she was treated by a psychiatrist and counselor.  Since 2001 her primary physician has taken over care of her psychiatric problems, and has been treating her with Celexa and Wellbutrin."  (Tr. at 235.)  Dr. Karayusuf noted that Plaintiff had been diagnosed with fibromyalgia as early as 1987.  (Tr. at 235.)

Dr. Karayusuf noted that Plaintiff was oriented to time, place and person, her immediate digit recall was good and she "recalled 7 digits forward and 4 digits backward."  (Tr. at 236.) Although she remembered that George W. Bush was the President of the United States, she could not recall any other recent Presidents.  (Tr. at 236.)  Plaintiff subtracted serial sevens accurately and with average speed.  Dr. Karayusuf noted that Plaintiff's recent and remote memory were intact, her intelligence was average and her insight was "minimal."  (Tr. at 236.)  Dr. Karayusuf noted that Plaintiff recalled two out of three unrelated objects after five minutes.  (Tr. at 236.)  Dr. Karayusuf stated that Plaintiff did not appear depressed throughout the interview, and diagnosed Plaintiff with "Major Depression, recurrent, in remission."  (Tr. at 236.)  Dr. Karayusuf opined that "[b]ased on her psychiatric, and not her physical condition she is able to understand, retain and follow instructions.  She is able to interact appropriately with fellow workers, supervisors, and the public. She is able to maintain pace and persistence.  She is able to manage benefits."  (Tr. at 236.)

On January 15, 2004, Plaintiff was seen by David J. Ridley, M.D., pursuant to Dr. Dashiell's

order that she obtain a rheumatology evaluation.  (Tr. at 264-65.)  Dr. Ridley conducted a routine examination, which was within normal limits.  (Tr. at 264.)  Dr. Ridley also conducted a joint examination, which was "[w]ithin normal limits with normal range or motion noted throughout the joints."  (Tr. at 265.)  In addition, Dr. Ridley performed a neurological examination which showed Plaintiff to be grossly intact.  (Tr. at 265.)  Dr. Ridley stated that Plaintiff "has obvious significant depression and . . . also fibromyalgia.  Her history correlates with the fact that when her depression worsen[ed] substantially her fibromyalgia also gave her much more difficulty, and if she is having much more trouble with her depression then she is with the fibromyalgia at this point in time."  (Tr. at 265.)  Dr. Ridley stated that he believed Plaintiff should be evaluated by a psychiatrist " to see if anything can be added to her medication or psychoanalysis" because this "may help and treat[ing] her depression would be more appropriate th[an] trying to address her fibromyalgia directly at this point in time."  (Tr. at 265.)

On February 5, 2004, Plaintiff was seen by Dr. Dashiell and reported that "any kind of physical activity for more than a few minutes seems to aggravate [her] pain."  (Tr. at 279.)  Plaintiff further reported that she was "cleaning houses and [wa]s finding that it [wa]s becoming impossible because of severe pain and severe fatigue just doing minutes of cleaning."  (Tr. at 279.)  Dr. Dashiell further noted that Plaintiff reported that her sleep was "broken and nonrefreshing," but the results of a recent sleep study confirmed that Plaintiff did not suffer from sleep apnea, nor was there any evidence of narcolepsy.  (Tr. at 279.)  Dr. Dashiell further opined that "[f]or now, it appears that she is probably not going to be able to continue working."  (Tr. at 280.)  Dr. Dashiell also noted that he thought Plaintiff's depression was significant and played a role in her symptoms.  (Tr. at 280.)

On March 30, 2004, Plaintiff was given the Minnesota Multiphasic Personality Inventory-2

("MMPI-2") by James N. Butcher, Ph.D.  (Tr. at 304-08.)  Dr. Butler noted that Plaintiff omitted

five items on the MMPI-2.  (Tr. at 306.)  Dr. Butler stated "[a]lthough this is not enough to

invalidate the resulting MMPI-2 clinical profile, some of her scale scores may be lower than

expected because of these omissions."  (Tr. at 306.)  Dr. Butler opined that "[t]he most frequent

diagnosis for individuals with this profile type is Dysthymic Disorder.   Physically disabling

conditions related to psychological stress, such as ulcers or hypertension, may be part of the clinical

pattern." (Tr. at 308.) Dr. Butler further opined that Plaintiff "harbors many negative work attitudes

that could limit her adaptability in the workplace.  Her low morale and lack of interest in work could

impair future adjustment to employment, a factor that should be taken into consideration in

treatment." (Tr. at 308.) Dr. Butler stated that Plaintiff "has difficulty managing routine affairs, and

the items she endorsed suggest a poor memory, concentration problems, and an inability to make

decisions."  (Tr. at 306.)

On March 30, 2004, Plaintiff began treatment with Dr. Howard Dickman.  (Tr. at 299-302.)

Although these treatment notes are not signed, Plaintiff's attorney informed the ALJ that Dr.

Dickman was the source of the notes at the hearing on this matter.  (Tr. at 342.)   Plaintiff was seen

by Dr. Dickman eight more times between March 2004 and June 2004.  (Tr. at 299-302.)  On June

10, 2004, Dr. Dickman filled out a form titled "Medical Opinion RE: Ability to Do Work-Related

Activities (Mental)." (Tr. at 290-92.) This form poses 25 different questions to a mental health care

provider to assess the individual's mental ability to perform work related activities.  The mental

health care provider is asked to rate each of these 25 questions in one of four categories: (1)

Unlimited or very good; (2) good; (3) fair; or, (4) poor or none.[1]  (Tr. at 290.)  In response to three

of these questions, Dr. Dickman rated Plaintiff's ability as "unlimited or very good."  (Tr. at 290.)

In response to 17 of these questions, Dr. Dickman rated Plaintiff's ability as "good."  (Tr. at 290-91.)

In response to five of these questions, Dr. Dickman rated Plaintiff's ability as fair.  In Dr. Dickman's

opinion, Plaintiff has a fair ability to "maintain attention for a two hour segment;" "maintain regular

attendance and be punctual within customary, usually strict tolerances;" "complete a normal

workday and workweek without interruption from psychologically based symptoms;" "perform at

a consistent pace without an unreasonable number and length of rest periods;" and a fair ability to

"deal with the stress of semi-skilled or skilled work."  (Tr. at 290-91.)  Dr. Dickman opined that, on

average, Plaintiff would be absent from work more than three times a month due to her impairments

or treatment for her impairments.  (Tr. at 292.)

On June 11, 2004, Dr. Dashiell filled out a form titled "Fibromyalgia Residual Functional

Capacity Questionnaire."  (Tr. at 293-98.)  At the outset of the form Dr. Dashiell noted that he had

been treating Plaintiff since September 2002 and that she periodically visited his office for treatment.

(Tr. at 293.)  Dr. Dashiell opined that Plaintiff met the American Rheumatological criteria for

fibromyalgia, and that she also suffered from Chronic Fatigue Syndrome, Depression, and Irritable

Bowel Syndrome.  (Tr. at 293.)  Dr. Dashiell opined that Plaintiff's prognosis was "poor-fair for

recovery for full time employment."  (Tr. at 293.)  When asked to identify the clinical findings,

laboratory and test results which showed Plaintiff's medical impairments, Dr. Dashiell wrote

---

[1] "Unlimited or very good" means that the individual's "[a]bility to function in this area
is more than satisfactory."  "Good" means that the individual's "[a]bility to function in this area
is limited but satisfactory."  "Fair" means that the individual's "[a]bility to function in this area
is seriously limited, but not precluded."  "Poor or none" means that the individual has "[n]o
useful ability to function in this area."  (Tr. at 290.)

"extreme fatigue, depression, multiple tender areas/trigger points." (Tr. at 293.) Dr. Dashiell opined

that Plaintiff impairments could be expected to last at least twelve months.  (Tr. at 293.)  Dr.

Dashiell noted that, "in some cases" emotional factors contributed to the severity of Plaintiff's

symptoms and functional limitations.  (Tr. at 294.)

When asked to describe the frequency, nature and severity of Plaintiff's pain, Dr. Dashiell

noted that Plaintiff experienced "dull aching fairly constant pain," that her "legs [were] constantly

numb" and that the severity of her pain was "moderately severe."  (Tr. at 294.)  When asked how

often Plaintiff experiences symptoms severe enough to interfere with attention and concentration,

Dr. Dashiell circled "frequently" and he also circled "Constantly."  (Tr. at 295.)  When asked to

what degree Plaintiff was limited in her ability to deal with work stress, Dr. Dashiell stated that

Plaintiff was severely limited in this area.  (Tr. at 295.) Dr. Dashiell opined that Plaintiff could walk

two city blocks without rest and that she could sit continuously at one time for ten minutes and stand

continuously at one time for five minutes.  (Tr. at 295.)  Dr. Dashiell opined that, in an eight hour

work day, Plaintiff could sit, stand and walk for less than two hours, and that she would need to get

up and walk around every fifteen minutes for five minutes at a time.  (Tr. at 296.)  Dr. Dashiell

opined that Plaintiff needed a job that permitted her to shift positions at will from sitting, standing

or walking.  (Tr. at 296.)  Dr. Dashiell noted that Plaintiff would need to take unscheduled breaks

during an eight hour work day at a rate of more than once an hour, and that Plaintiff would have to

rest for two hours before returning to work.  (Tr. at 296.)  Dr. Dashiell noted that Plaintiff could

frequently carry less than ten pounds, and she had significant limitations performing tasks that

require repetitive reaching, handling or fingering.  (Tr. at 297.)  In Dr. Dashiell's opinion, on

average, Plaintiff is likely to be absent from work more than three times a month as a result of her

impairments or the treatments for her impairments.  (Tr. at 297.)

  **C.**  **Plaintiff's Testimony**

  Plaintiff testified that she has custody of two minor children and lives with her fiancé.  (Tr. at 343-44.)  Plaintiff testified that she received medical assistance and was also receiving prorated food stamps and child support.  (Tr. at 345.)  Plaintiff testified that she started her own business performing cleaning services because she was fired from her previous job due to her memory problems.  Plaintiff testified that she thought she could work part time at her cleaning service and still make enough money to support her family.  (Tr. at 348.)  Plaintiff testified that, "[i]n the end, I started breaking multiple vacuum cleaners, items in the homes.  My hands would be numb from - - and the pain and weakness and then I . . . went part time . . . and in the end I was sleeping three to five hours after each job."  (Tr. at 348-49.)  Plaintiff testified that she felt she was able to perform more work in the beginning of 2003 than she was by the end of 2003.  Plaintiff stated:

> beginning of 2003, I was recovering from a rollover car accident that happened November 2002 so I was . . . feeling like I'd heal.  At that point I was still denying the chronic fatigue, fibromyalgia diagnosis and by summer I was having problems driving to . . . [and] from my jobs [and] I'd be so fatigued after the jobs I'd actually be scared.  I'd rear-ended other vehicles, couldn't drive my kids anywhere that last summer and by the end of the summer I realized I wasn't capable of maintaining those hours so I cut down [in an attempt to continue working.]

(Tr. at 349.)  Plaintiff testified that, although she cut back on her hours in an attempt to keep working, her condition did not improve and she still found that she had to rest throughout the day because she continued to experience "a lot of pain and weakness."  (Tr. at 349.)  Plaintiff testified that she did not believe that she could perform any of her past relevant work such as being a payroll clerk, because she has "a lot of problems with her memory" and "[w]hen she get[s] . . . headaches or [is] . . . fatigued [she] ha[s] days where [she] ha[s] a hard time remembering things."  (Tr. at 350.)

**D.      Vocational Expert's testimony**

Mr. Norman Mastbaum testified at the hearing on this matter as the Vocational Expert

(hereinafter "VE").  (Tr. at 350-56.)  The ALJ asked the VE to consider the following hypothetical

person, based on the Fibromyalgia RFC questionnaire filled out by Dr. Dashiell on June 11, 2004:

> [a]n individual of [Plaintiff's] age, her educational background, her work-history
> experience, suffering from chronic fatigue, irritable bowel syndrome and depression
> . . . multiple tender points, nonrestorative sleep fatigue, stiffness, depression, anxiety,
> pain basically in all right/left bilateral shoulders, arms, hands, fingers, hips, dull
> aching fairly constant pain, legs constantly numb, moderate severity, affected by
> changing weather . . . overuse static positions . . . symptoms severe enough to
> interfere with attention and concentration from frequently to constant . . . a severe
> limitation on ability to deal with work stress, two blocks walking without rests, sit
> for ten minutes and stand for six minutes, stand and walk . . . less than two hours,
> needs a two-hour rest before returning to work, doesn't need to elevate her legs,
> basic sedentary lifting restrictions, significant limitations in repetitive reaching,
> handling and fingering . . . 25 percent right and left for grasp, turn, twist and fine
> manipulation, bend and twist at the waist is 50-percent bend, 50-percent twist, good
> and bad days [and would miss work due to her conditions] more than three times a
> month.

(Tr. at 351-52.)  The VE testified that such a person would not be capable of performing either

Plaintiff's past relevant work or any other type of work.  (Tr. at 352.)  The ALJ asked the VE to

consider a second hypothetical individual with Plaintiff's age educational background that fit the

description provided in the physical RFC completed a State Agency physician on January 2, 2004.

The ALJ stated that such an individual had the

> ability to lift 50 pounds occasionally, and frequently stand and sit at six hours,
> push/pull's unlimited, indicates [Plaintiff] sustained injury in '02, which appears to
> have healed normally and is without further impairment, [Plaintiff's] claims of pain
> are partially credible, no other primary symptom since '99 . . . Mentally, there would
> be some limitations, reduced tolerance for stress, moderate problems with detailed
> and marked problems with complex instructions but having the capacity to

> concentrate on, understand and remember routine repetitive three and four step tasks,
> persistence and pace adequate for those, brief and frequent superficial contact with
> the public, coworkers and supervisors . . . routine repetitive stress handling ability
> would be adequate.

(Tr. at 352-53.)  The VE testified that such a person would be capable for performing Plaintiff's past relevant work as a cleaner.  (Tr. at 353.)  The VE testified that there were 13,000 cleaning jobs available in the Minnesota economy, and that 50 percent of those jobs would "nominally fit . . . within those parameters.  The other percentages would fit within the executive housekeeping and would fit within . . . those individuals that are supervising crews and things of that nature so . . . at least 50 percent would fit within the hypothetical."  (Tr. at 353.)

The ALJ asked the VE to consider a third hypothetical with the "same individual, same age, same educational background, same physical and mental RFCs, but in addition thereto is going to be missing more than three days a month secondary to these physical and mental problems that she's got."  (Tr. at 353.)  The VE testified that the third hypothetical individual would not be capable of competitive employment.  (Tr. at 353.)

### E.    The ALJ's Decision

 The ALJ issued an unfavorable decision on June 24, 2004.  (Tr. at 23-33.)  The ALJ engaged in the five step analysis as required by 20 C.F.R. §§ 404.1520 and 416.920.  (Tr. at 24.)  The ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged date of the onset of her disability.  (Tr. at 24.)  The ALJ determined that Plaintiff suffers from "fibromyalgia, degenerative changes of the cervical and lumbar spine, status post tibial fracture, and depression, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Tr. at 25.)  The ALJ further noted that Plaintiff

11

"asserts that she is also impaired by multiple chemical sensitivities." (Tr. at 25.)  The ALJ noted

that he must determine whether Plaintiff retained the RFC to perform the requirements of her past

relevant work.  The ALJ noted that Plaintiff "testified that she suffers from multiple chemical

sensitivities and fibromyalgia which result in significant fatigue [but that the ALJ found] . . . that

[Plaintiff's] allegation of inability to perform any work activity is not fully consistent with her actual

functional capabilities, the medical evidence, and the overall evidence of record."  (Tr. at 25.)

The ALJ noted that he needed to take the holding of Polaski v. Heckler, 739 F.2d 1320,

1321-22 (8th Cir.1984) and Social Security Ruling 96-7p into account when he evaluated Plaintiff's

subjective complaints of pain.  (Tr. at 25.)  The ALJ stated that Plaintiff's "allegations of disabling

pain and incapacitating limitations are not consistent with or supported by the objective medical

record of treating and examining physicians."  (Tr. at 26.)  The ALJ then reviewed Plaintiff's

medical history prior to her alleged onset date for disability.  The ALJ stated that Plaintiff was

prescribed Prozac as early as 1994 for the treatment of menstrual moodiness and cramping.  (Tr. at

26.)  In October 1995, the ALJ noted that Plaintiff presented to Dr. John Doyle, her family

physician, complaining of fatigue.  (Tr. at 26.)  The ALJ noted that in February, 1997, Plaintiff

presented to her primary clinic complaining of fatigue and that her fatigue was attributed to an upper

respiratory infection.  (Tr. at 26.)  The ALJ noted that in June 1998 Plaintiff was seen for an annual

physical by Dr. Larry Foster, and Plaintiff admitted to "depressive symptoms of insomnia, depressed

mood, difficulty with concentration and short-term memory, anhedonia, apathy, appetite and libido."

(Tr. at 26.)  At that time the ALJ noted that "Dr. Foster noted no significant abnormalities other than

endogenous depression."  (Tr. at 26.)

In June 1998 Plaintiff was seen for a psychiatric evaluation with Dr. Jeffrey Erickson, who

diagnosed Plaintiff with major depressive disorder and prescribed Luvox as an anti-depressant.  (Tr. at 26.)  By August of 1998 the ALJ noted that Plaintiff reported "more energy, better ability to concentrate, and generally a better feeling of balance since starting Luvox."  (Tr. at 26.)  In August 1998 Plaintiff began to meet with Phil Anderson, LICSW, LMFT.  (Tr. at 26.)  The ALJ noted that in October 1998 Plaintiff reported similar improvement of her symptoms as a result of Luvox.  (Tr. at 26.)

In February 1999 the ALJ noted that Plaintiff reported seeing a psychiatrist and a psychologist for depressive symptoms and reported that she was taking Serzone for her depression.  (Tr. at 27.)  The ALJ noted that Plaintiff was thereafter referred to Dr. Marilee Votel-Kveel for evaluation of her chronic fatigue syndrome.  (Tr. at 27.)  The ALJ stated that "Dr. Votel-Kvaal noted that [Plaintiff] has had ongoing complaints of diffuse body aches, fatigue, depression with confusion and memory loss, intermittent ear-ringing, and frequent somatic symptoms . . . [and that] Dr. Votel-Kvall noted symptoms of chronic fatigue possibly related to [Plaintiff's] depression."  (Tr. at 27.)  The ALJ further noted that Plaintiff returned to Dr. Erickson in September 2000 and reported that she was not taking her Serzone during the summer and was feeling more depressed.  (Tr. at 27.)  In December 2000, Plaintiff was seen by a new therapist, Neddy Thompson, MSW, LICSW.  (Tr. at 27.)

In April 2001 the ALJ noted that Dr. Erickson switched Plaintiff from Serzone to Celexa "with positive results."  (Tr. at 27.)  In July 2001 the ALJ noted that Plaintiff presented for a psychological evaluation with Shepard Myers, Ph.D., and at that time she was only experiencing mild symptoms of depression.  (Tr. at 28.)  During a follow up visit with Dr. Joseph Gendron, Dr. Gendron determined that Plaintiff was suffering from Major Depression which was currently in

remission.  (Tr. at 28.)  In May 2002 Plaintiff was treated for a tibial fracture that she sustained as a result of a motorcycle accident.  (Tr. at 28.)  Her orthopedic surgeon, Dr. James Young, noted that Plaintiff was restricted to sedentary employment based on her limited ambulation.  (Tr. at 28.)  The ALJ further noted that Plaintiff was evaluated by Dr. Alford Karayusuf in December 2003 and was diagnosed with recurrent major depression that was in remission at that time.  (Tr. at 28.)  The ALJ also noted that Plaintiff was evaluated by Dr. Dashiell in December 2003, and that Dr. Dashiell "assessed fibromyalgia (FM) and chronic fatigue, myalgias, and arthralgia associated with FM as well as possible sleep disorder."  (Tr. at 28.)  The ALJ noted that Plaintiff underwent a sleep study but that she was not diagnosed with a sleep disorder.  (Tr. at 29.)  The ALJ further noted that Dr. Mulrooney opined that the results of the sleep study, together with Plaintiff's other complaints, suggested that her symptoms of chronic fatigue may well be a part of her depressive disorder that was not responding to treatment with the anti-depressants Wellbutrin and Celexa.  (Tr. at 29.)

The ALJ noted that Plaintiff was referred for a rheumatology evaluation with Dr. David Ridley in January 2004, and that Dr. Ridley diagnosed Plaintiff with fibromyalgia and depression.  (Tr. at 29.)  The ALJ noted that Dr. Ridley recommended a psychiatric evaluation to treat her depression as Plaintiff's depression appeared more significant to Dr. Ridley at the time.  (Tr. at 29.)  The ALJ further noted that Plaintiff presented for a psychological evaluation in March 2004, was diagnosed with dysthymia, and that her MMPI profile "suggested dysthymic disorder with physically disabling conditions related to psychological distress."  (Tr. at 29.)  The ALJ further noted that Plaintiff "views herself as having so many problems that she is no longer able to function effectively in day-to-day situations.  Her low mood and pessimistic outlook on life weigh heavily on her and seemingly keep her from acting to better her situations."  (Tr. at 29.)  The ALJ noted that,

in June 2004, Plaintiff's treating psychologist reported that Plaintiff has

> only fair abilities to maintain attention for 2-hour segments, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with the stress of semi-skilled and skilled work.

(Tr. at 29-30.)  Finally, the ALJ noted that Dr. Dashiell reported that Plaintiff "lacks the physical capacity to perform even sedentary work on a competitive basis."  (Tr. at 30.)

After reviewing Plaintiff's medical record, the ALJ concluded that "based on [Plaintiff's] mental impairment, [Plaintiff] has mild limitations in daily functioning and moderate limitations in social functioning . . . moderate limitations in concentration, persistence or pace but in light of her daily functioning appears capable of at least routine, repetitive tasks, 3 to 4 step uncomplicated instructions, and routine stress."  (Tr. at 30.)  The ALJ further concluded that there was "no evidence of episodes of decompensation [nor] . . . evidence to support the presence of C criteria."  (Tr. at 30.)

The ALJ concluded that

> [a]fter careful consideration of the entire record and giving [Plaintiff] the benefit of every reasonable doubt . . . [Plaintiff] retains the following [RFC]: lifting and carrying 50 pounds occasionally and frequently; standing and/or walking 6 hours of an 8 hour day; sitting 6 hours of an 8 hour day, unlimited pushing and pulling; reduced stress tolerance but adequate for routine, repetitive 3 and 4 step tasks; and brief, infrequent, and superficial contact with the public, co-workers and supervisors.

(Tr. at 30.)

The ALJ noted that the statements of Plaintiff's treating and examining physicians were not "fully consistent" with Plaintiff's allegations but were "generally consistent" with the ALJ's RFC assessment.  (Tr. at 30.)  The ALJ noted that there were conflicting opinions in the record regarding the issue of disability, and that Plaintiff had been evaluated for chronic fatigue syndrome and fibromyalgia.  (Tr. at 30.)  The ALJ stated that he understood that

>fibromyalgia as a medical condition is not objectively supportable; however, treating source opinions suggest that [Plaintiff's] fatigue and fibromyalgic symptoms were significantly related to her depression.  With respect to [Plaintiff's] depression, she experienced a significant improvement in symptoms with the use of Celexa such that her depression was considered in remission status and she discontinued formal mental health treatment.

(Tr. at 30.)  The ALJ noted that in late 2003, from the medical records on file, it appears that Dr. Dashiell assumed care of all of Plaintiff's conditions.  The ALJ noted that Dr. Dashiell referred Plaintiff for a rheumatology evaluation, and that the rheumatologist referred Plaintiff for a psychiatric evaluation because her depression appeared more severe than her fibromyalgia.  (Tr. at 30.)

The ALJ also noted that Plaintiff did not return to formal mental health treatment until March 2004 and that in June Plaintiff's treating psychologist, Dr. Dickman, considered Plaintiff disabled from work.  (Tr. at 30-31.)  The ALJ concluded that Dr. Dickman's opinion was "not objectively supported."  (Tr. at 31.)  The ALJ stated that Dr. Dashiell "also considered [Plaintiff] disabled from work due to physical conditions" but that Dr. Dashiell's "opinion is not well-supported by objective findings."  (Tr. at 31.)  The ALJ concluded that "these opinions are not afforded controlling weight as [Plaintiff] does not meet the 12-month durational requirement for a finding of disability."  (Tr. at 31.)  The ALJ noted that it appeared, from the medical record, that Plaintiff had "experienced a full recovery from her tibial fracture as she stopped seeing her orthopedic surgeon."  (Tr. at 31.)  The ALJ stated that he "placed appropriate consideration on the non-examining opinions of the state examiners and considered the opinions a fair and reasonable representation of [Plaintiff's] current level of functioning."  (Tr. at 31.) (citing to SSR 96-6p.)  The ALJ stated that he also considered Plaintiff's "own estimation of functioning as well as her actual level of functioning" and he found "insufficient evidence to support a conclusion that [Plaintiff] is disabled."  (Tr. at 31.)

16

After announcing that he found insufficient evidence to support a finding that Plaintiff is disabled, the ALJ stated:

> [Plaintiff] testified that she is divorced and the single parent of two minor children. She is currently engaged to be married.  She is independent in her personal cares.  She also engages in a wide range of housework including cooking, dishes, shopping and laundry.  She testified that she maintains a drivers license and drives. [She] continued to work through February 2004. [Plaintiff] also enjoys craft.  Accordingly, after considering all relevant factors with respect to [Plaintiff's] impairments, the undersigned finds that the weight of the record establishes that [Plaintiff] retains the [RFC] for the range of work outlined above.

(Tr. at 31.)  The ALJ noted that the VE testified that Plaintiff could perform her past relevant work cleaning houses and that approximately 6,500 such jobs exist in the Minnesota economy.  (Tr. at 31.) The ALJ stated "[o]n the basis of the credible and persuasive testimony of the neutral vocational expert, the undersigned finds that [Plaintiff] is capable of returning to her past relevant work" and therefore, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act at any time through the date of the ALJ's decision.  (Tr. at 31.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir.1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir.1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.1989).   Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  See Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co., v. NLRB, 305 U.S. 197, 220 (1938)).  In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.1999); see also

17

Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir.2000); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996).  "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently.  Roberts v. Apfel, 22 F.3d at 468. (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993)).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo.  See Flynn v. Chater, 107 F.3d 617, 620 (8th Cir.1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir.1996).  The Court must "defer heavily to the findings and conclusions of the SSA."  Howard v. Massanari, 255 F.3d 577, 581 (8th Cir.2001).

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  In making the disability determination the Secretary promulgated a sequential evaluation process that applies to both physical and mental disorders. 20 C.F.R. §404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled.  The disability determination requires a step-by-step analysis.  See 20 C.F.R. §404.1520(a).  At the first

step, the ALJ must consider Plaintiff's work history.  At the second step, the ALJ must consider the medical severity of Plaintiff's impairments.   At the third step, the ALJ must consider whether Plaintiff has an impairment or impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations.  <u>See</u> 20 C.F.R. 404.1520(d).  If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past relevant work.  If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled.  If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." <u>Cunningham v. Apfel</u>, 222 F.3d 496, 501 (8th Cir.2000).

## IV.  CONCLUSIONS OF LAW

Plaintiff does not challenge the ALJ's findings as to steps one through three.  Therefore, the Court will only review the ALJ's finding as to step four; that is, that Plaintiff retains the RFC to perform her past relevant work as a cleaning person.  This review requires the Court to determine whether the opinion of Plaintiff's treating psychiatrist, Dr. Howard Dickman, and Plaintiff's treating physician, Dr. Thomas Dashiell, were afforded the appropriate weight by ALJ Quayle.

According to the Code of Federal Regulations, a treating physician's opinion is to be afforded "controlling weight" when the opinion is "well-supported by medically acceptable clinical and laboratory  diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2).  Under the regulations, a "treating source" is a physician, psychologist, or other acceptable medical source who has an "ongoing treatment

relationship" with the claimant, i.e., the claimant has seen the physician "with a frequency consistent with accepted medical practice" for the condition.  See 20 C.F.R. § 404.1502. Under the Social Security regulations, where an ALJ determines that a treating source's opinion is not entitled to controlling weight, an ALJ considers the following factors in deciding what weight to give the treating source's opinion: (1) the examining relationship; (2) the treatment relationship, considering the length, frequency of examination, nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical evidence; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is that of a specialist on issues relating to his or her specialty; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(1)-(6).  Generally, the opinions of doctors who do not examine the plaintiff do not ordinarily constitute substantial evidence to support a finding of non-disability.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  The ALJ is required to give more weight to the opinion of a treating source versus a non-treating source.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even where a treating physician's opinion is not afforded "controlling weight", "a treating physician's opinion should be accorded substantial weight."  Prince v. Bowen, 894 F.2d 283, 285 (8th Cir.1990).

The Eighth Circuit has stated "[g]enerally, even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if . . . the treating physician contradicts the consulting physician's opinion." Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir.2001); see also Lanning v. Heckler, 777 F.2d 1316, 1318 (8th Cir.1985) (quoting Hancock v. Secretary of Dept. of Health, Educ. and Welfare, 603 F.2d 739, 740 (8th Cir.1979)).  However, "[t]he conclusions of any medical expert may be rejected 'if inconsistent with the medical record

as a whole.'" Davis v. Apfel, 239 F.3d 962, 967 (8th Cir.2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir.1995)). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir.2000). No matter what weight the ALJ determines should be afforded the treating physician's opinion, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir.2005)(quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ may give special weight only to a practitioner's medical judgment about the nature and severity of a claimant's impairments. 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). If a medical practitioner expresses an opinion on an issue that is reserved to the Commissioner, such as the claimant's RFC, whether a claimant is disabled, or whether the claimant meets a Listing, the ALJ must consider the opinion, but Social Security regulations expressly bar him from giving any special significance to the source of the opinion, and it is never entitled to controlling weight. 20 C.F.R. §§ 404.1527(e)(3); SSR 96-5p.

However "medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing . . . and . . . it may be necessary to decide whether to adopt or not adopt each one." SSR 96-5p. A claimant's RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect . . . her capacity to do work-related physical and mental activities." SSR 96-8p. The RFC is an assessment of the claimant's "maximum remaining ability

21

to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p. A "regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p.

The RFC assessment is "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' - - i.e., opinions about what the individual can still do despite . . . her impairment(s)." SSR 96-8p. The RFC assessment "must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. While the ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000), the Eight Circuit has also noted that a claimant's RFC is "a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000).

> **A.** **The ALJ Did Not Give Good Reasons for Disregarding the Opinions of Dr. Dashiell, Plaintiff's Treating Physician.**

In the present case, Plaintiff argues that the ALJ failed to follow the Social Security Administration's own rulings and regulations by not granting controlling weight to Dr. Dickman's opinion and Dr. Dashiell's opinion regarding Plaintiff's RFC. Plaintiff argues that these opinions are well supported by medically acceptable clinical and laboratory techniques and that they are not inconsistent with other substantial evidence in the record; therefore, they should have been afforded controlling weight by the ALJ.

Social Security Ruling 96-2p discusses the policy of giving controlling weight to the medical opinions of treating sources. That opinion states "[e]ven if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it is also 'not inconsistent'

with the other substantial evidence in the record." SSR 96-2p at *1.  This ruling further states that

the term "not inconsistent" is

> used to indicate that a well-supported treating source medical opinion need not be
> supported directly by all of the other evidence (i.e., it does not have to be consistent
> with all the other evidence) as long as there is no other substantial evidence in the
> case record that contradicts or conflicts with the opinion.  Whether a medical opinion
> is 'not inconsistent' with the other substantial evidence is a judgment that
> adjudicators must make in each case.

SSR 96-2p at *3.  The ruling further states that the term

> substantial evidence . . . describes a quality of evidence [and] . . . is intended to
> indicate that the evidence that is inconsistent with the opinion need not prove by a
> preponderance that the opinion is wrong.  It need only be such relevant evidence as
> a reasonable mind would accept as adequate to support a conclusion that is contrary
> to the conclusion expressed in the medical opinion.

SSR 96-2p at *3.

Fibromyalgia has been described as "a common but elusive and mysterious[] disease."

Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir.1996).  It is so described precisely because

> [i]ts cause or causes are unknown, there is no cure, and, of greatest importance to
> disability law, its symptoms are entirely subjective.  There are no laboratory tests for
> the presence or severity of fibromyalgia.  The principal symptoms are 'pain all over,'
> fatigue, disturbed sleep, stiffness, and . . . multiple tender spots, more precisely 18
> fixed locations on the body (and the rule of thumb is that the patient must have at
> least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly
> cause the patient to flinch.

Id. at 306.  In addition, "[p]hysical examinations [of patients with fibromyalgia] usually yield normal

findings in terms of full range of motion, no joint swelling, normal muscle strength and normal

neurological reactions."  Swain v. Commissioner of Social Security, 297 F.Supp.2d. 986, 990

(N.D.Ohio.2003).

In the present case, Dr. Dashiell completed a Fibromyalgia RFC questionnaire and opined

that Plaintiff met the American Rheumatological criteria for fibromyalgia. (Tr. at 293.) When asked

to describe the clinical findings, laboratory and test results that show Plaintiff's medical impairments, Dr. Dashiell stated that Plaintiff suffered from "extreme fatigue, depression, multiple tender areas/trigger points." (Tr. at 293.)  Dr. Dashiell described Plaintiff's pain as "moderately severe" and noted that she experienced "dull aching fairly constant pain [and that her] legs [were] constantly numb." (Tr. at 294.)  Dr. Dashiell opined that Plaintiff could walk two city blocks without rest, that she could only sit continuously for ten minutes at a time and stand continuously for five minutes at a time. (Tr. at 295.)  In addition, Dr. Dashiell opined that Plaintiff could only sit, stand or walk for a total of less than two hours in an eight hour working day. (Tr. at 296.)  Dr. Dashiell opined that Plaintiff would need to take unscheduled breaks more than once per hour during an eight hour work day, and that Plaintiff would have to rest, on average, two hours before returning to work. (Tr. at 296.)  Dr. Dashiell further opined that Plaintiff could lift and carry less than ten pounds frequently in a competitive work situation, and that Plaintiff would be likely to be absent from work more than three times per month as a result of her impairments or treatments for her impairments. (Tr. at 297.)

Dr. Dashiell had an ongoing treatment relationship with Plaintiff.  Dr. Dashiell offered an opinion regarding the nature and severity of Plaintiff's impairments.  As such, Dr. Dashiell's opinion should have been afforded controlling weight by the ALJ if it was well supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence in the record.  The ALJ is required to give good reasons for the weight afforded to a treating physician's evaluation, and in the present case the ALJ failed to do so.  The ALJ erred when he failed to give good reasons for failing afford the opinion of Dr. Dashiell controlling weight. The Court is unclear as to the reasons the ALJ failed to give Dr. Dashiell's opinions controlling

weight.  Therefore, it is impossible for the Court to determine whether these reasons constitute good reasons for disregarding substantial portions of Dr. Dashiell's opinion; specifically, that Plaintiff could not lift or carry more than ten pounds frequently, that Plaintiff could only sit, stand and walk for less than two hours total in an eight hour working day, that Plaintiff would sometimes need to take unscheduled breaks more than once an hour and would have to rest two hours, on average, before returning to work, and that Plaintiff would be likely to be absent from work more than three times a month as a result of her impairments or treatment for her impairments.

Prior to assessing Plaintiff's physical RFC, the ALJ engaged in a discussion of the medical records Plaintiff submitted in support of her disability claim.  The ALJ summarized Dr. Dashiell's opinions in the Fibromyalgia RFC questionnaire with the following sentence "Dr. Dashiell reported that [sic] lacks the physical capacity to perform even sedentary work on a competitive basis."  (Tr. at 30.)  In assessing Plaintiff's physical RFC, the ALJ stated that Plaintiff retained the RFC to lift and carry 50 pounds occasionally and frequently, stand and/or walk six hours and sit six hours in an eight hour day, and was unlimited as far as engaging in activities that required pushing or pulling.  (Tr. at 30.)  The ALJ attempted to justify the physical RFC by stating that "[s]tatements from the treating and examining physicians are not fully consistent with the claimant's allegations but are generally consistent with the [RFC] described herein."  (Tr. at 30.)  The ALJ noted that controlling weight is to be given to a treating physician's opinion where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  After noting this, the ALJ further noted that he believed there were "conflicting opinions regarding the issue of disability."  (Tr. at 30.)  The ALJ stated that he understood "that fibromyalgia as a medical condition is not objectively supportable; however,

25

treating source opinions suggest that [Plaintiff's] fatigue and fibromyalgic symptoms were significantly related to her depression." (Tr. at 30.)

After noting that treating source opinions suggest that Plaintiff's fatigue and fibromyalgic symptoms were significantly related to her depression, the ALJ began to analyze the medical evidence concerning Plaintiff's depression, stating that "she experienced a significant improvement in symptoms with the use of Celexa and psychotherapy such that her depression was considered in remission . . . and she discontinued formal mental health treatment." (Tr. at 30.) The ALJ then noted that "[w]hile Dr. Dashiell . . . reported that she [sic] began to treat [Plaintiff] in 2002, the earliest records show that [Plaintiff] met with Dr. Dashiell in late 2003. At that time, it appears that he had assumed care of all her conditions." (Tr. at 30.) The ALJ went on to note that Plaintiff was then referred for a rheumatology evaluation, and the rheumatologist referred Plaintiff "for a psychiatric evaluation as her depression appeared more severe than her fibromyalgia." (Tr. at 30.) Then the ALJ noted that Plaintiff returned to formal mental health treatment in March 2004, and that by June her treating psychologist considered Plaintiff to be disabled from work. The ALJ stated that this opinion was not objectively supported. The ALJ further opined that Dr. Dashiell's opinion that Plaintiff was disabled from work due to physical conditions was not well supported by objective findings. After opining that Dr. Dashiell's opinions were not well supported by objective findings the ALJ then made the following curious conclusion "[t]he undersigned notes that these opinions [of Dr. Dickman and Dr. Dashiell that Plaintiff is disabled from work] are not afforded controlling weight as [Plaintiff] does not meet the 12 month durational requirement for a finding of disability." (Tr. at 31.)

Thereafter the ALJ abruptly switched topics, and stated that it appeared that Plaintiff had

fully recovered from her tibial fracture. The ALJ concluded that he "placed appropriate consideration on the non-examining opinions of the state examiners and considered the opinions a fair and reasonable representation of [Plaintiff's] current level of functioning." (Tr. at 31.) The ALJ noted that he had "also considered [Plaintiff's] own estimation of functioning as well as her actual level of functioning." (Tr. at 31.) In support of his conclusion that there was insufficient evidence to support a finding that Plaintiff was disabled, the ALJ noted that Plaintiff

> testified that she is divorced and the single parent of two minor children. She is currently engaged to be married. She is independent in her personal cares. She also engages in a wide range of housework including cooking, dishes, shopping and laundry. She testified that she maintains a driver's license and drives. [Plaintiff] continued to work through February, 2004. [Plaintiff] also enjoys crafts. Accordingly, after considering all the relevant factors with respect to [Plaintiff's] impairments, the undersigned finds that the weight of the record establishes that [Plaintiff] retains the [RFC] for the range of work outlined above.

(Tr. at 31.) Based on this finding, the ALJ concluded that Plaintiff retained the RFC to perform her past relevant work as a cleaner. (Tr. at 31.)

The ALJ's analysis of whether to give Dr. Dashiell's opinion controlling weight is seriously flawed. At the outset, the Court notes that the ALJ did not give good reasons for disregarding the opinions of Dr. Dashiell contained in the Fibromyalgia RFC form that he completed. The ALJ simply stated that neither Dr. Dashiell's nor Dr. Dickman's opinions were afforded controlling weight because Plaintiff "does not meet the 12-month durational requirement for a finding of disability." (Tr. at 31.) The ALJ also noted that Plaintiff's treating sources suggested that Plaintiff's fibromylagic symptoms were significantly related to her depression, and that her depression was in remission. The ALJ did not give good reasons for disregarding Dr. Dashiell's opinions; specifically, that Plaintiff could not lift or carry more than ten pounds frequently, that Plaintiff could sit, stand and walk for less than two hours total in an eight hour working day, that Plaintiff would sometimes

27

need to take unscheduled breaks more than once an hour and would have to rest two hours, on average, before returning to work, and that Plaintiff would likely be absent from work more than three times a month as a result of her impairments or treatment for her impairments.

Not only did the ALJ fail to address these various opinions, but he failed to give good reasons for disregarding those opinions. A treating physician's opinion regarding the nature and severity of Plaintiff's impairments will be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The ALJ did not provide evidence that Dr. Dashiell's opinion was not well supported by medically acceptable clinical techniques, nor did he give good reasons to believe that the opinion was inconsistent with the other substantial evidence in the record. The fact that treating sources opined that Plaintiff's fibromyalgic symptoms were related to her depression does not lessen Dr. Dashiell's opinion regarding Plaintiff's physical RFC. Likewise, the fact that Plaintiff's routine and joint examinations were within normal limits, that she had normal range of motion, and that her neurological examination was grossly intact is not evidence that Dr. Dashiell's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, as persons suffering from fibromyalgia are expected to have normal test results in this regard. Therefore, the Court concludes that the ALJ failed to give good reasons for disregarding the opinions of Dr. Dashiell, and recommends that this case be remanded for further proceedings consistent with this opinion. If, on further review, the ALJ determines that Dr. Dashiell's opinion should be afforded controlling weight, the ALJ is required to engage another VE and pose a hypothetical to the VE that accurately encompasses the physical RFC that Plaintiff is capable of performing.

**B.      The ALJ's Decision to Afford Plaintiff's Treating Psychologist's Opinion Lesser Weight is Supported by Substantial Evidence on the Record As A Whole.**

The ALJ's decision to afford Dr. Dickman's opinion lesser weight is supported by substantial evidence on the record as a whole.  The ALJ found that Plaintiff has "mild limitations in daily functioning and moderate limitations in social functioning."  (Tr. at 30.)  In addition the ALJ concluded that Plaintiff " has moderate limitations in concentration, persistence, or pace but in light of her daily functioning appears capable of at least routine, repetitive tasks, 3 to 4 step uncomplicated instructions, and routine stress."  (Tr. at 30.)  The ALJ noted that there was "no evidence of episodes of decompensation [nor was there] evidence to support the presence of C criteria."  (Tr. at 30.)

In support of these conclusions the ALJ noted that Plaintiff experienced significant improvement in the symptoms she experienced as a result of her depression when she used the prescription drug Celexa and psychotherapy.  (Tr. at 30.)  The ALJ noted that this treatment was so effective "that her depression was considered in remission status and she discontinued formal mental health treatment."  (Tr. at 30.)  The ALJ noted that Plaintiff returned to formal mental health treatment in March 2004 and that by June 2004 her treating psychologist, Dr. Dickman, had opined that he considered Plaintiff disabled from work, but that Dr. Dickman's opinion was not objectively supported.  (Tr. at 31.)  After noting that this opinion was not objectively supported, the ALJ noted that Plaintiff "is independent in her personal cares.  She . . . engages in a wide range of housework including cooking, dishes, shopping and laundry.  She testified that she maintains a driver's license and drives. [Plaintiff] continued to work through February, 2004. [Plaintiff] also enjoys crafts." (Tr. at 31.)  Based on her activities of daily living, along with the other evidence in the record, the ALJ concluded that Plaintiff has "mild limitations in daily functioning . . . moderate limitations in social

29

functioning . . . moderate limitations in concentration, persistence or pace but in light of her daily functioning appears capable of at least routine, repetitive tasks, 3 to 4 step uncomplicated instructions, and routine stress." (Tr. at 30.)

The ALJ's determination of Plaintiff's mental RFC is supported by substantial evidence in the record as a whole. Of the 25 categories in which Dr. Dickman was asked to evaluate Plaintiff's mental abilities to perform work related activities, Dr. Dickman never opined that Plaintiff had poor or no ability to perform work related activities. Of the 25 categories, Dr. Dickman rated Plaintiff's ability as fair in only five of those categories; that is, in Dr. Dickman's opinion Plaintiff's ability to function in those areas was seriously limited, but not precluded. Dr. Dickman opined that Plaintiff had a fair ability to "[m]aintain attention for two hour segments"; "[m]aintain regular attendance and be punctual within customary tolerances"; "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform at a consistent pace without an unreasonable number and length of rest periods"; and a fair ability to "[d]eal with the stress of semiskilled and skilled work". (Tr. at 290-91.) Dr. Dickman rated Plaintiff's ability to perform three of the categories as unlimited or very good and Plaintiff's ability to perform the other 17 categories as good. (Tr. at 290-91.) Dr. Dickman then opined, without further comment, that, on average, Plaintiff's impairment or her treatment for her impairment would cause Plaintiff to be absent from work more than three times per month. (Tr. at 292.)

Dr. Dickman's opinion that Plaintiff's impairment and treatment for her impairment will cause her to be absent from work more than three times per month is inconsistent with other substantial evidence in the record and is inconsistent with his own opinions. Dr. Dickman opined that Plaintiff retained a good ability to perform 17 of 25 work related activities. In addition, Dr.

Dickman opined that Plaintiff had a good ability to perform three out of the four mental abilities and attitudes needed to perform semiskilled and skilled work.  (Tr. at 291.)  This level of performance ability is inconsistent with Dr. Dickman's opinion that Plaintiff would miss three or more days of work per month due to her impairments or treatments for her impairments.  Furthermore, this opinion is inconsistent with other substantial evidence in the record.  The evidence in the record shows that Plaintiff has previously experienced a significant improvement in her depression symptoms with the use of Celexa and psychotherapy, and this improvement is inconsistent with Dr. Dickman's opinion, based on eight visits with Plaintiff between March 2004 and June 2004, that Plaintiff was likely to miss three of more days of work per month due to her depression or treatment for her depression.  Furthermore, the findings of the consultative examiner, Dr. Alford Karayusuf, support the ALJ's findings regarding Plaintiff's mental RFC and do not support a finding that Plaintiff would be likely to miss three or more days a month due to her depression or treatment of her depression.  Indeed, Dr. Karayusuf diagnosed Plaintiff with recurrent Major Depression that was in remission at the time of his evaluation.  (Tr. at 236.)  Therefore, substantial evidence exists on the record as a whole to support the ALJ's decision to not grant the opinion of Dr. Dickman controlling weight, insofar as it relates to Dr. Dickman's conclusion that Plaintiff is likely to miss three or more days of work per month due to her depression and treatment for her depression.  Therefore, the ALJ properly determined Plaintiff's mental RFC.

## V.  RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [# 14] be **DENIED**; and

31

2.      Defendant's Motion for Summary Judgment [# 17] be **DENIED**; and

3.      The case be **REMANDED** to the Commissioner of Social Security for further proceedings consistent with this Report and Recommendation.

DATED: August 18, 2006                    s/ *Franklin L. Noel*
                                          FRANKLIN L. NOEL
                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **September 7, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.